IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GLORY D. SANDERS, on behalf of ) 
MANIECCIA G. FRANCIS, )
)
    Plaintiff, )
) No. 13 C 8658
v. )
) Magistrate Judge Sidney I. Schenkier
CAROLYN W. COLVIN, Acting )
Commissioner of Social Security, )
)
    Defendant. )

## MEMORANDUM OPINION AND ORDER[1]

Glory Sanders, on behalf of her daughter, plaintiff Manieccia Francis, seeks an order reversing and remanding the Administrative Law Judge's ("ALJ's") decision denying her claim for disability benefits (doc. # 15), and the Commissioner has filed a motion asking the Court to affirm (doc. # 22). For the reasons that follow, we grant plaintiff's request to remand and deny the Commissioner's motion.

### I.

We first review the record, followed by the hearing testimony and the ALJ's opinion.

### A.

Ms. Sanders, as Ms. Francis's mother and "plenary guardian," filed an application for disability benefits on behalf of Ms. Francis on January 27, 2011, alleging that Ms. Francis became disabled and unable to work beginning on September 1, 2010, at 36 years old, due to depression, anemia, psychosis, and degenerative joint disease (R. 69). Ms. Francis has a high school education and has worked as a cashier and customer service associate, but she has never

---

[1] On March 21, 2014, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 10).

worked at the level of substantial gainful activity (R. 24, 29). She has two children, neither of whom lives with her and her mother. Her teenaged daughter lives in an Illinois Department of Children and Family Services ("DCFS") group home and her teenaged son lives with friends or with his step-grandmother (R. 51-52).

On December 15, 2010, Ms. Francis was brought to Hartgrove Hospital by her sister and police after Ms. Francis was "reportedly very hostile, very agitated, actively hallucinating, talking to self and expressing severe paranoia and suspicious, stating that she has been very angry because her family was trying to hurt her" (R. 243). She was then transferred to Loretto Hospital, which admitted her for closer monitoring and to prevent harm to herself and others after assessing that Ms. Francis was "very guarded, very suspicious, and expressing paranoid delusional thinking, unable to function, unable to care for self with poor insight and judgment" (*Id.*). While at the hospital, Ms. Francis was at times irritable, isolative, withdrawn, tearful and depressed (R. 253-67). She was diagnosed with psychotic disorder and was administered Risperdal (antipsychotic), Trazodone (anti-depressant) and Haldol (anti-psychotic), among other medications (R. 244, 260).

Ms. Francis was discharged from the hospital on December 27, 2010, and transferred directly to Winston Manor Nursing Home (R. 269). The transfer form indicated that Ms. Francis was independent in bed activity, personal hygiene, dressing, feeding, communication and locomotion (R. 312-13). Discharge notes indicated that Ms. Francis was still considered a potential danger to herself, but that her demeanor was calm and cooperative (R. 268-69).

On April 22, 2011, Ana Gil, M.D., S.C., completed a psychiatric examination of Ms. Francis on behalf of the Department of Disability Services ("DDS"). Ms. Francis reported that in the past, she had been suspicious of her family and had experienced crying spells and feelings of

sadness and worthlessness, but she was doing better with medication and no longer had those feelings (R. 302). Ms. Francis reported that she could dress and groom herself and care for her own hygiene, but the nursing home staff cooked, cleaned and shopped for her (R. 304). She also stated that she enjoyed watching television, listening to the radio, and playing bingo (*Id.*). Dr. Gil observed that Ms. Francis was friendly and engaging, and hopeful about the future (R. 72). She diagnosed Ms. Francis with major depression, single episode, with psychotic features, which was severe and currently in remission with psychiatric treatment (R. 305).

On May 10, 2011, Kirk Boyenga, Ph.D., completed a psychiatric review technique for DDS based on Dr. Gil's examination (R. 73). He opined that Ms. Francis's affective disorder was a severe impairment but did not meet Listing 12.04 (*Id.*). Applying the Paragraph B criteria, Dr. Boyenga found that Ms. Francis had only mild restriction of activities of daily living and only mild difficulties in maintaining social functioning, but moderate difficulties in maintaining concentration, persistence or pace and one or two episodes of decompensation (*Id.*). He opined that although Ms. Francis has a history of affective disorder and had a "brief psychotic episode," she has had "rapid response to medical care" and medication (R. 76). Though Ms. Francis "does little while living in the nursing home," Dr. Boyenga stated that Ms. Francis's examination responses showed that she is capable of performing simple and detailed routine tasks and leaving home alone, albeit with reduced interpersonal contact (*Id.*). Dr. Boyenga also noted that Ms. Francis's residence in the nursing home was "apparently related to being homeless and having had a psychotic episode" (*Id.*).

Ms. Francis also had an internal medicine consultative examination on April 22, 2011, conducted by Fauzia Rana, M.D., at the request of DDS (R. 293). Dr. Rana noted that Ms.

Francis was obese, but the only physical impairment listed was anemia (*Id.*).[2] Dr. Rana found that Ms. Francis had no physical limitations, and opined that she could "sit, stand, walk, carry, speak, and hear without difficulty" (R. 295-96). On May 11, 2011, based on Dr. Rana's examination, DDS consultant Francis Vincent, M.D., opined that Ms. Francis did not have any severe physical impairments, including any disorders of the back (R. 73).

While at the nursing home, Ms. Francis continued to receive psychiatric treatment and medication. On June 15, 2011, Dr. Bernardo Livas examined her. He reported that Ms. Francis was diagnosed with major depression and psychosis NOS, but her prognosis was "good" and she was "stabilized" and compliant with her treatment plan at that time (R. 326). Dr. Livas noted that her mother wanted to take her home, and Ms. Francis appeared capable of taking care of herself, but he did not issue a discharge order for her because she was still an imminent danger to herself and others (R. 276).

On July 9, 2011, the nursing home filled out a quarterly "resident assessment and care screening" for Ms. Francis, in which Ms. Francis and her guardian participated (R. 327-65). The assessment indicated that Ms. Francis experienced disorganized thinking (including rambling or irrelevant conversation) and delusions (misconceptions or beliefs that are firmly held and contrary to reality), but no symptoms of fatigue, depression, trouble concentrating, or suicidal thoughts (R. 333-36). She required supervision and set-up help for bathing, dressing, eating, personal hygiene, and medication, but needed no help in bed mobility, locomotion and toilet use (R. 340-41). While Ms. Francis sometimes forgot about her anti-psychotic and anti-depressant medication, she did not refuse to take it (R. 353, 364-65). Ultimately, the determination was made that discharge to the community was not feasible (R. 358).

---

[2] A medical report from July 2011 indicated that Ms. Francis was 66 inches tall and weighed 218 pounds (R. 348).

On September 6, 2011, a non-examining DDS consultant, Michael Schneider, Ph.D., reviewed the evidence of mental impairment -- including the July 9, 2011 assessment -- on reconsideration. He noted that Ms. Francis denied all symptoms of depression and delusions, although a third party stated that she sleeps all the time (R. 85). Dr. Schneider opined that current evidence showed Ms. Francis to be functioning at a normal or near normal level and that her affective disorder and psychotic disorder were not severe impairments and caused only mild restrictions in activities of daily living, social functioning, and maintaining concentration, persistence or pace, and she had suffered only one or two episodes of decompensation (R. 86).

On November 28 or 29, 2011, Ms. Francis was released from the nursing home into the care of her mother, Ms. Sanders (R. 6, 24). Ms. Francis was discharged with several medications, including Risperidone, Trazodone, and Haloperidol (R. 7). However, she stopped taking her medications after she was released from the nursing home, despite her mother's urging, because she claimed that nothing was wrong with her and she did not need them (R. 50, 58).

On January 25, 2012, Ms. Sanders took her daughter to see psychiatrist S.J. Puszkarski, M.D., who conducted the most recent examination of Ms. Francis (R. 42). Ms. Francis denied any symptoms or problems, telling Dr. Puszkarski that she was well and did not need the doctor's help (R. 369). Dr. Puszkarski stated that Ms. Francis "convincingly denied" that she had "suicidal or self[-]injurious ideas or impulses," and denied having hallucinations or delusions. Dr. Puszkarski also observed no signs of anxiety (*Id.*). He diagnosed her with schizoaffective disorder-bipolar type, and gave her a Global Assessment Functioning score of 65 (*Id.*).

### B.

Plaintiff and her mother appeared without an attorney or non-attorney representative at the hearing before the ALJ, held on March 16, 2012 (R. 37). Before beginning the hearing, the

ALJ told Ms. Francis that she had a right to be represented by an attorney or non-attorney representative. The ALJ explained to Ms. Francis that:

> An attorney or other representative can help you with your case, can help you present your case, explain medical terms, and just generally help you present the case that's in the light most favorable to you. A representative may charge you for expenses but it will not and cannot charge you a fee unless I approve a fee. And attorneys and representatives don't get fees unless you win your case. So you don't have to pay money up front for an attorney, they would get paid if you win your case out of your back benefits award. And the fee is capped by statute at 25 percent of the back pay award or $6,000, whichever is greater. So I want to make sure that you're aware of that and are also aware that there are legal service organizations that can -- will provide free legal representation if you qualify under their rules, and this is usually need-based. And before you do proceed I do want to make sure that you do understand that you have a right to a representative.

(R. 37-38). Ms. Sanders stated that she did consult a lawyer, "but when she looked at her case and her file and saw all the bills that she owed, like to the nursing home . . . At first they [were] going to take it but then when she called her and they talked to her herself, she's in great denial about she need help, so they dismiss it and said they don't want to handle the case" (R. 38). Rather than respond to Ms. Sanders's explanation of her attempt to obtain representation, the ALJ asked Ms. Francis if she understood her right to an attorney and wanted to proceed without one, to which Ms. Francis replied affirmatively and then signed a waiver (R. 39-40, 135).

The ALJ proceeded to ask Ms. Francis about her medical treatment. Ms. Francis stated that the only doctor she was familiar with is "Dr. Levis," and that she did not receive any other treatment (R. 41). Ms. Sanders interjected that she was unable to get treatment for Ms. Francis when she was in the nursing home, and that when she came out, Ms. Sanders took her to St. Mary's Behavior Clinic on January 25, 2012, but that Ms. Francis was "in great denial that she need[s] help . . ." (R. 42). The ALJ told Ms. Sanders to stop interjecting (R. 48-49).

Plaintiff testified that she believed that, at the time of her hospitalization, there was "nothing[] wrong" with her -- she just felt a "little depressed" -- but her mother felt she had a

6

problem (R. 49). She was angry at her family for making her go to the hospital, but she was "getting over it" (R. 55-56). Ms. Francis testified that she was transferred from the hospital to the nursing home because she had nowhere else to live (R. 50).

Ms. Francis told the ALJ that "things have been going great" since she was discharged from the nursing home, but she was frustrated because she could not find a job, though she was ready to get back to work (R. 47, 51). She testified that she had a "great" relationship with her mother and her children; she sees her daughter on a regular basis but only sees her son when he wants something (R. 51-52). Ms. Francis washes dishes and helps clean the house, but since there is nothing else to do, she watches television most of the day (R. 52). She does not grocery shop or cook, and she has no social activities or hobbies, but she stated that she is not depressed anymore (R. 53-55).

The ALJ then questioned Ms. Sanders, who explained that she was appointed to serve as Ms. Francis's legal guardian because Ms. Francis "wasn't mentally able to take care of herself and her children" (R. 57). Ms. Sanders stated that she visited her daughter almost every day at the nursing home, and Ms. Francis seemed to do pretty well on her medications, but then she stopped taking them after leaving the nursing home because she feels there is "nothing wrong with her" (R. 58). The ALJ questioned Ms. Sanders's belief that Ms. Francis could not work, stating that Ms. Francis "seems to be functioning" and "hasn't had any more episodes" needing hospitalization (R. 59). Ms. Sanders responded that was because her daughter "sleeps all the time anyway" and watches television at night (*Id.*). Ms. Sanders further testified that Ms. Francis had conversations with herself and made loud sounds when "she's in great anxiety or frustration or depression," but that Ms. Francis would deny it (R. 60).

7

The ALJ next asked the vocational expert ("VE") to assume an individual with the same age, education and work experience as Ms. Francis, with no exertional limitations, but limited to simple, routine tasks, who can understand, remember, and carry out simple work instructions, but could not tolerate more than occasional changes in the work setting and was limited to no more than occasional interaction with the public or supervisors (R. 62-63). The VE testified that a significant number of jobs existed for that individual, but no jobs were available to an individual who would be off task 25 percent of the work day (R. 63).

The ALJ asked Ms. Francis and Ms. Sanders if they had anything they would like to add (R. 64-65). Ms. Sanders repeated that she believes her daughter "needs help but she's in great denial about her capabilities . . .," and Ms. Francis again denied having any mental health problems (*Id.*).

## C.

In his May 3, 2012 opinion, the ALJ determined that Ms. Francis had one severe impairment: major depression with psychotic features, single episode (R. 21). He stated that the "alternative diagnosis" of schizoaffective disorder offered by Dr. Puszkarski was not supported by the "longitudinal record" or Ms. Francis's testimony that she had no symptoms of depression, mania and psychotic process (*Id.*). In addition, the ALJ determined that Ms. Francis's obesity and anemia were not severe impairments because the evidence -- including normal physical examinations and "limited physical treatment records" -- showed that they did not have more than a *de minimis* effect on her ability to perform basic work activities (R. 21-22). The ALJ also relied on Ms. Francis's testimony that she is not tired, and she believes she can work (R. 22).

At Step 3, the ALJ found that Ms. Francis's impairments, alone or in combination, do not meet or medically equal the severity of a listed impairment (R. 22). The ALJ considered the

8

paragraph B criteria of Listing 12.04 for Ms. Francis's mental impairments. He found that Ms. Francis had only mild restriction in activities of daily living because she reported to Dr. Gil that she was able to dress herself and care for her personal hygiene and take public transportation, and, at the nursing home, she enjoyed watching television, listening to the radio, playing bingo, and eating ice cream (*Id.*). The ALJ found only mild difficulties in social functioning because Ms. Francis has a friend, reads the newspaper, and gets along with her mother and children (*Id.*). The ALJ determined that Ms. Francis had "(at most) moderate limitations" in concentration, persistence or pace because she performed "fairly well" during the consultative mental status examination and denied any psychiatric symptoms or problems, but the ALJ "[c]redit[ed] the subjective complaints of the claimant's mother at the hearing, which were denied by the claimant" (*Id.*) In addition, the ALJ stated that Ms. Francis had experienced one to two episodes of decompensation of extended duration when she was hospitalized with "significant psychiatric symptoms" in December 2010, but the ALJ "credit[ed] the DDS assessment that she has shown 'rapid response to medical care'" (R. 22-23).

The ALJ then assigned Ms. Francis with the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following non-exertional limitations: "limited to simple, routine tasks such that she can understand, remember, and carry out simple work instructions, but is unable to perform complex decision making; she can tolerate no more than occasional changes in the work setting in terms of work process and products; no more than simple workplace judgments; and no more than occasional contact with public, co-workers, and supervisors" (R. 23).

The ALJ concluded that "[t]here is no evidence that her psychotic symptoms persisted or recurred beyond the single December 2010 episode," and that the "limited records" from the

9

nursing home "reflect only routine and conservative treatment for both mental and physical issues" (R. 26-27). In reaching these conclusions, the ALJ did not mention the nursing home's findings, as late as July 2011, that Ms. Francis still posed a risk to herself and others; had disorganized thinking and delusions; required supervision for the most basic tasks; and was not ready to be discharged to her mother's care. The ALJ also stated that Ms. Francis lived in the nursing home after her hospitalization because "she did not have anywhere else to live" (R. 24); but, the ALJ did not explain why living with her mother was not available to Ms. Francis throughout 2011, since that is where she lived when she was released from the nursing home in November 2011.

The ALJ gave "some weight" to the non-examining DDS opinions because the ALJ found them "well-supported" and "consistent with the evidence in the record," including treatment records showing that Ms. Francis had improved with treatment and medication (R. 22, 29). However, the ALJ determined Ms. Francis was more mentally impaired than Dr. Schneider found, and said that he accounted for that in determining Ms. Francis's RFC (R. 29). Again, in finding the non-examining opinions consistent with the record, the ALJ omitted any mention of the records from the nursing home in June and July 2011 stating that Ms. Francis was not ready to be discharged because she was unable to function independently in certain basic daily activities, had disorganized thinking and delusions, and was a danger to herself and others.

The ALJ also relied heavily on Ms. Francis's testimony. In his opinion, the ALJ stated that "[t]o the extent that the claimant and her mother allege disability, the allegations are not fully credible, as they are not supported by the objective medical evidence. However, the claimant did credibly testify at the hearing that she believes she could work and that she is not disabled" and that "she is no longer depressed" (R. 25). The ALJ stated that Ms. Francis's

testimony was supported by the "longitudinal record, which shows that the claimant is doing well with medication and treatment" and has been stable since her psychiatric hospitalization in December 2010 (*Id.*). The ALJ also found her testimony was supported by the most recent treatment records from Dr. Puszkarski, which showed that Ms. Francis was not having psychotic symptoms and was doing "reasonably well," despite discontinuing her medications (R. 28). Moreover, the ALJ noted that no treating or examining medical source provided a statement inconsistent with the assessed RFC (R. 29). Therefore, although Ms. Francis had never before worked at a level of substantial gainful activity, the ALJ determined that jobs existed in significant numbers that Ms. Francis could perform (*Id.*).

## II.

"We review the ALJ's decision deferentially only to determine if it is supported by substantial evidence, which we have described as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014) (internal citations and quotations omitted). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review. A decision that lacks adequate discussion of the issues will be remanded." *Moore v. Colvin*, 743 F.3d 1118, 1120-21 (7th Cir. 2014) (internal citations omitted). For several reasons, we find that remand is required here.

### A.

We agree with plaintiff that remand is required because the ALJ failed to obtain a valid waiver of counsel and failed to adequately develop the record. A Social Security applicant's right

to be represented by counsel at a disability hearing is statutory, but the right may be waived. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (internal citations omitted). "To ensure valid waivers, ALJs must explain to *pro se* claimants (1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees." *Id.* (internal quotations omitted).

### 1.

In this case, the ALJ mentioned all three parts of this required explanation to Ms. Francis at the hearing. However, the Commissioner's defense of the adequacy of the waiver fails to come to grips with the fact that the waiver was signed by Ms. Francis, a person under a plenary guardianship imposed by an Illinois court applying Illinois law. Illinois law allows that kind of total guardianship over the person only when: (1) it has been demonstrated by clear and convincing evidence that the person is disabled (meaning that because of mental deterioration, mental illness or physical incapacity, the person is "not fully able to manage his person" (755 ILCS 5/11a-2)); and (2) "it has been demonstrated by clear and convincing evidence that because of his disability he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning the care of his person." 755 ILCS 5/11a-3(a). The guardianship order appointing Ms. Sanders to serve as guardian indicates that based on testimony by Ms. Francis's family and medical reports, Ms. Francis was judged "totally without understanding or capacity to make or communicate decisions regarding his/her person" and "totally unable to manage his/her estate or financial affairs" (R. 138). The ALJ was not at liberty to assume that Ms. Francis had the ability to make a decision that, under Illinois law, she had been deemed incapable of making in a responsible manner.

12

Moreover, contrary to the Commissioner's argument (doc. # 23: Comm'r Mem. at 6), the fact that Ms. Sanders stood by mutely while Ms. Francis signed the waiver form was not enough to eliminate any error. When introduced by the ALJ as Ms. Francis's mother, Ms. Sanders interjected that she was also Ms. Francis's legal guardian (R. 37) -- which was plain from the written record already before the ALJ (*e.g.*, R. 138-39). Then, after the ALJ directed his explanation of the waiver of counsel issues to Ms. Francis, Ms. Sanders again interjected that she had tried, but failed, to obtain an attorney (R. 37-38). Nevertheless, the ALJ asked Ms. Francis, not Ms. Sanders, whether she wished to proceed without an attorney, and directed Ms. Francis to sign and date the waiver of counsel form (R. 39). Thus, we find that the ALJ did not obtain an adequate waiver of counsel.[3]

**2.**

Of course, the failure to obtain a valid waiver of counsel does not require a remand so long as the ALJ takes the steps necessary to "fully and fairly" develop the record. *Binion v. Shalala*, 13 F.3d 243, 245-46 (7th Cir. 1994). "The ALJ's failure to obtain a valid waiver of counsel heightens his duty to develop the record. . . . [T]he ALJ must scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts," and the burden is on the Commissioner to show the ALJ adequately developed the record. *Skinner*, 478 F.3d at 841-42. Indeed, even if there was a valid waiver of counsel, the ALJ has "a duty to develop the record, particularly when a claimant appears *pro se*." *Smith v. Astrue*, 467 F. App'x 507, 511 (7th Cir. 2012). The ALJ failed to perform that duty here.

---

[3]Plaintiff also challenges the adequacy of the waiver based on the failure of the ALJ to identify for Ms. Sanders sources she might contact in order to obtain counsel, which plaintiff says the ALJ should have done in light of Ms. Sanders's disclosure that she had unsuccessfully sought to obtain counsel and clearly lacked knowledge about the sources of representation that are available (doc. # 15: Pl.'s Mem. at 11-12). In light of our foregoing discussion, while we agree that providing this information at a minimum would have been the wiser course to pursue, we need not address whether the failure to provide this information independently renders the waiver invalid.

13

*First*, as plaintiff points out (Pl.'s Mem. at 15), the ALJ failed to question Ms. Francis or her mother about Ms. Francis's condition during the period of alleged onset, commencing on September 1, 2010, three months before Ms. Francis was brought to the hospital. Instead of probing into the behavior and symptoms that led plaintiff's mother and sister to seek her involuntary admission to the hospital, the ALJ's questions began in December 2010, when plaintiff entered the hospital. This omission was significant: Ms. Francis was in a hospital or a transitional care facility from December 15, 2010 through the end of November 2011, just a few weeks short of the 12-month period required to establish disability. *See* 42 U.S.C. § 423(d)(1)(A). In addition, evidence of the time preceding Ms. Francis's involuntary admission to the hospital could bear on whether Ms. Francis met or equaled Part C of Listing 12.04, which requires proof that the claimant had chronic affective disorder of at least two years' duration that caused more than a minimal limitation of ability to do basic work activities, and repeated episodes of decompensation, each of extended duration (which may include less frequent episodes of longer duration),[4] or current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04. Thus, it was important for the ALJ to develop the record with evidence (medical or other) of Ms. Francis's condition during at least the three-month period from her alleged onset date until her hospitalization.

The Commissioner argues that the failure to develop the record for this time period was of no moment, on the ground that the relevant time period began in January 2011, when plaintiff filed her claim (Comm'r Mem. at 6-9). This argument flies in the face of the agency's own Social Security Rulings, which state that "[t]here may be instances where it is necessary to establish that disability has existed for several consecutive months (possibly up to 12 months)

---

[4] 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00.

immediately prior to the date of filing in order to assure that the severity/blindness requirements of the law are met." SSR 83-20. For example, medical documentation prior to the application date may be relevant to an assessment of the severity and/or duration of certain mental conditions where an earlier onset must be established . . . . *Id.* Thus, the ALJ erred by not developing the evidence of Ms. Francis's condition at least back to September 2010, the claimed onset date.

*Second*, the ALJ failed to adequately develop the record into the nature and extent of Ms. Francis's mental impairments during the eleven months of treatment at the nursing home, beginning on December 28, 2010. The ALJ failed to develop the evidence that was presented in Cook County Circuit Court in support of Ms. Sanders's petition for guardianship in January 2011. The Order appointing Ms. Sanders plenary guardian over Ms. Francis's person states that medical reports and testimony was presented in support of guardianship (R. 138). The ALJ, however, failed to obtain the evidence from the court file, which surely would be relevant to a determination of the extent of Ms. Francis's limitations as they might affect her ability to work. In addition, as the ALJ pointed out, the nursing home notes in the record were "limited," including only medical notes from December 2010, January 2011, June 2011, and July 2011. These notes indicated that Ms. Francis was taking anti-depressant and anti-psychotic medication and was being encouraged to participate in group therapy activities, but the ALJ made no attempt to get any missing or additional treatment records from the nursing home. Ms. Sanders's statements at the hearing showed that she was confused as to who was responsible for obtaining treatment records. The ALJ erred in not seeking to obtain these documents as part of his duty to "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Skinner*, 478 F.3d at 841-42.

15

## B.

Plaintiff also argues that the ALJ's findings as to her mental impairments were not supported by substantial evidence (Pl.'s Mem. at 15-18; doc. # 24: Pl.'s Reply at 9-11). We agree.

The ALJ's determinations as to Ms. Francis's mental impairments demonstrate forbidden "cherry-picking" of the evidence, which created an incomplete picture of Ms. Francis's condition. "An ALJ need not mention every piece of medical evidence in her opinion, but she cannot ignore a line of evidence contrary to her conclusion." *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). Rather, "[t]he ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected." *Moore*, 743 F.3d at 1123

The ALJ relied heavily on Ms. Francis's testimony that she did not have mental health problems and was able to work. But, the ALJ failed to explain why it was proper to credit those statements by a person under a guardianship and with documented mental health problems. The ALJ credited Ms. Francis's testimony that she stayed in the nursing home because she had nowhere else to live, but ignored the hospital's transfer notes and the nursing home treatment notes stating that Ms. Sanders was willing to provide a place for Ms. Francis to live but that Ms. Francis was not ready to be discharged to the community due to her mental state. Likewise, the ALJ found Ms. Francis's testimony that she could work to be credible, but the ALJ did not address the fact that Ms. Francis had never sustained substantial gainful employment and that throughout the time period covered by the record, Ms. Francis lived either in a hospital (where she had been involuntarily committed due to a psychotic episode), a nursing home (where she received continued psychiatric medication and treatment), or in the care of her mother.

By contrast, the ALJ stated that Ms. Sanders's testimony that Ms. Francis was in denial regarding her symptoms was less than fully credible. The ALJ reasoned that "the claimant's testimony is supported by the longitudinal record, which shows that the claimant is doing well with medication and treatment" since her hospitalization in December 2010 (R. 25). This reasoning, however, ignores the fact that while living with her mother, Ms. Francis refused to take her medications, despite her mother's pleas that she do so and despite agreement by medical personnel at the hospital and nursing home that Ms. Francis required medication for her mental impairments. The ALJ failed to adequately explain why he did not find Ms. Sanders's testimony credible, when her daughter's condition required her to shoulder the burden of taking Ms. Francis into her home and caring for her.

Moreover, the ALJ erred by failing to consider that Ms. Francis's refusal to take her medications is, in itself, "one of the most serious problems in the treatment of mental illness." *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010). Ms. Francis stated that she refused to take her medications because she did not believe she was mentally impaired, and she testified that she did not believe she was mentally impaired even when she was involuntarily admitted to the hospital. The ALJ should have considered that Ms. Francis may not be the most accurate reporter of her condition, and that her condition may be more disabling that she believed it to be. *See Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001) ("With regard to mental disorders, the Commissioner's decision must take into account evidence indicating that the claimant's true functional ability may be substantially less than the claimant asserts . . ."); *see also Scrogham v. Colvin*, 765 F.3d 685, 696 (7th Cir. 2014) (finding that the ALJ erred in failing to consider at least two periods of time when the claimant's condition was possibly more disabling than she believed it to be).

17

We are mindful that the ALJ also relied on the January 2012 evaluation by Dr. Puszkarski, which may suggest that Ms. Francis is not disabled, as it stated that Ms. Francis "convincingly denied" symptoms of depression and assigned her a "relatively high GAF," even though she had discontinued her medications (R. 27-28). However, we see no evidence that the ALJ took into account that, "a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (collecting cases). And, the ALJ cannot only focus on the evidence that supports his conclusion and ignore the evidence that points to Ms. Francis's mental illness. To do otherwise fails to build a logical path between the evidence and the ALJ's conclusions. *See Phillips v. Astrue*, 413 Fed. App'x 878, 886 (7th Cir. 2010) (noting that the ALJ erred by "stress[ing] only the few hopeful observations, increased GAF scores, and any comments about [the claimant's] speedy improvement," rather than assessing the overall picture of the claimant's mental impairment).

## CONCLUSION

For the reasons stated above, we grant Ms. Sanders' request to remand the ALJ's decision (doc. # 15), and we deny the Commissioner's motion to affirm (doc. # 22). The case is remanded for further proceedings consistent with this opinion. The case is terminated.

ENTER:

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

DATE: March 24, 2015